UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x
ANDREW BERKOWITZ,

                                                    Case No.:  18 Civ. 2682 (        )

                    Plaintiff,

          -against-                                 **COMPLAINT**

COPART, INC. and DAVE HAGEN,                        **Jury Trial Demanded**

                    Defendants.
------------------------------------------------------x

ANDREW BERKOWITZ, by and through his attorneys, The Bellantoni Law Firm, PLLC, as and for his Complaint states:

## NATURE OF THE ACTION

1.      This is an action for, *inter alia,* economic, compensatory, punitive damages, costs and attorney's fees, proximately resulting from defendants' unlawful discrimination against the plaintiff based on his gender.

## JURISDICTION

2.      The Court's jurisdiction over the plaintiff's federal claims is invoked pursuant to 28 U.S.C. §1331, 28 U.S.C. §1343, and supplemental jurisdiction over the plaintiff's state law claim is proper pursuant to 28 USC § 1367.  On November 3, 2017, Plaintiff timely filed a complaint with the United States Equal Employment Opportunity Commission premised on gender discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended 42 U.S.C. §2000e, *et seq.* The United States Department of Justice, Civil Rights Division duly issued to the plaintiff a notice of the right to institute a lawsuit dated December

16

27, 2017.

## THE PARTIES

3.      Plaintiff, ANDREW BERKOWITZ, ("Plaintiff"), is a citizen of the United States,  a domiciliary of the State of New York, and a resident of the Northern Counties.

4.      Plaintiff is a male.

5.      Defendant, COPART, INC., ("Copart") is a foreign business corporation that regularly engages in business in Ulster County, New York.

6.      Copart has annual revenues of approximately $1.45 billion and employs approximately 4,800 individuals.

7.      Defendant, DAVE HAGEN, ("Hagen"), was at all relevant times employed by Copart, Inc.

8.      At all times relevant herein, Hagen was acting within the scope of his employment with Copart.

## MATERIAL FACTS

9.      Copart is an auto auction company with auto salvage yards located throughout the United States and internationally.

10.     Copart liquidates total loss vehicles for the insurance industry and auctions donated vehicles for charities.

11.     Plaintiff was hired by Copart on June 15, 2015.

12.     Before he was hired, Plaintiff was required to take and pass a business and management skills test (the "management test") to be considered for the Assistant Manager position.

16

13.     Plaintiff took the management test on June 3, 2015 and passed with a high grade.

14.     Plaintiff was thereafter hired by Copart to work at the auto salvage yard located in Marlboro, New York (the "Marlboro facility").

15.     Plaintiff was hired to fill the vacant Assistant General Manager position at the Marlboro facility.

16.     When Plaintiff was hired, he was the sole Assistant General Manager for the Marlboro facility.

17.     When Plaintiff was hired, there was only one Assistant General Manager position at the Marlboro facility.

18.     When Plaintiff was hired, Jennifer McMillan ("McMillan") was the "Office Manager" of the Marlboro facility.

19.     Throughout Plaintiff's employment with Copart, Defendant David Hagen was the "General Manager" of the Marlboro facility.

20.     Hagen was Plaintiff's direct supervisor.

21.     Hagen had the authority to affect the terms and conditions of Plaintiff's employment.

22.     Cherie Hargrove ("Hargrove") was a "Regional Manager" of Copart, whose managerial territory included the Marlboro facility.

23.     Office Manager, Jennifer McMillan ("McMillan"), had unsuccessfully applied for the Assistant General Manager position that was filled by Plaintiff.

24.     At no point in time was McMillan qualified to assume the duties and responsibilities of the Assistant General Manager position.

16

25.     One example of McMillan's lack of qualifications to serve as an Assistant General Manager was the fact that she failed the business and management skills test that Plaintiff took and passed.

26.     McMillan was less qualified than Plaintiff for the Assistant General Manager position.

27.     Plaintiff was McMillan's direct supervisor and she was required to report directly to him.

28.     From the beginning of Plaintiff's employment, McMillan was aloof and unhelpful.

29.     Two months after Plaintiff was hired, a decision was made at Copart's corporate level to eliminate the business and management skills testing requirement for the Assistant General Manager position.

30.     Once the business and management skills test was eliminated as a requirement for the Assistant General Manager position, Hagen created a second Assistant General Manager position specifically for McMillan.

31.     Hagen promoted McMillan from Officer Manager to be a co-Assistant General Manager with Plaintiff.

32.     Plaintiff learned from another employee in passing that Hagen promoted McMillan to share Plaintiff's position and title.

33.     Plaintiff's educational and professional background and experience far exceed that of McMillan's.

34.     Hagen later informed Plaintiff that he would now "share" his position and duties with McMillan.

16

35.     Hagen reassigned at least half of Plaintiff's duties and responsibilities as Assistant General Manager to McMillan.

36.     Hagen initially told Plaintiff that Plaintiff and McMillan would rotate responsibility between the salvage yard duties and the administrative office duties.

37.     The auto salvage yard (the "Yard") is located over ½ mile away from the administrative office.

38.     McMillan rarely performed yard duties.

39.     There is no bathroom at the Yard.

40.     The mud and dust in the Yard create a very demanding and challenging work environment.

41.     The Yard has no internet service and no telephones.

42.     Plaintiff's first annual review was performed in June 2016.

43.     Plaintiff received the maximum allowable raise in the amount of 4%.

44.     In October 2016, a regional management team building event was scheduled to be held in Poughkeepsie, New York.

45.     Plaintiff was expected to attend the regional management team building event.

46.     Plaintiff planned to attend the regional management team building event.

47.     Immediately before the event, Hagen directed Plaintiff to stay behind at the Yard.

48.     Hagen instructed Plaintiff not attend the regional management team building event.

49.     The day after the regional management team building event, Plaintiff learned that Hagen and McMillan spent a significant amount of time with Regional Manager Cherie Hargrove ("Hargrove") at the event.

16

50.     Most of the time spent between Hagen, McMillan and Hargrove at the event involved drinking.

51.     That same week, Plaintiff's remaining office responsibilities were eliminated.

52.     That same week, Plaintiff was relegated to the Yard on a permanent basis.

53.     Not long after being permanently assigned to the Yard, Hagen informed Plaintiff, "When I retire, Jennifer [McMillan] is going to take over as General Manager."

54.     A few weeks later, Hagen called Plaintiff into his office and informed him that McMillan's "crazy husband" called Regional Manager Cherie Hargrove to inform her that Hagen and McMillan were having an affair.

55.     Having an affair with a subordinate is against Copart company policy and constitutes grounds for termination.

56.     Near the end of 2016, Plaintiff was called to the facility to respond to a false alarm in the middle of the night related to a breach in the electric fence.

57.     When Plaintiff arrived at the facility in the middle of the night, he observed Hagen's vehicle and McMillan's vehicles parked at the administrative office.

58.     Hagen subsequently learned that Plaintiff responded to the false alarm by way of the alarm log email the next morning.

59.     A few weeks later, and early on a Sunday morning, Plaintiff again received an alarm call for the facility.

60.     This time, the call was for a tripped alarm at the administrative office building.

61.      As Plaintiff was leaving his house to respond to the call, Hagen placed three calls to Plaintiff and ordered him not to respond to the facility.

62.     Hagen informed Plaintiff that he accidentally tripped the alarm.

16

63.     Hagen had never before instructed Plaintiff not to respond to an alarm call.

64.     On prior occasions, Plaintiff had driven over 30 minutes to respond to an alarm only to find that Hagen was already at the Yard and had not called Plaintiff to let him know.

65.     From that point on, Hagen and McMillan's treatment of Plaintiff deteriorated beyond repair and Plaintiff's work environment with Hagen and McMillan became patently hostile and malevolent.

66.     Hagen openly yelled at Plaintiff for no reason and in front of other employees.

67.     Hagen openly disparaged Plaintiff in front of other employees.

68.     Plaintiff refrained from any negative response because he did not want to lose his job.

69.     Hagen was attempting to bait Plaintiff into conduct that would provide Hagen with grounds to terminate Plaintiff.

70.     Plaintiff remained respectful at all times and continued to perform in an exemplary manner.

71.     McMillan treated Plaintiff as if he did not exist.

72.     McMillan stopped speaking to Plaintiff directly, refused to greet Plaintiff and eventually, became openly hostile toward Plaintiff in the presence of other employees.

73.     In January 2017, Plaintiff learned that McMillan had taken a few days off from work to have breast augmentation surgery, which was readily apparent when she returned to work.

74.     When another employee speculated out loud that Hagen paid for the surgery, the employee was called into Hagen's office and threatened with termination.

75.     In January 2017, Hagen reassigned two key Yard employees to other Copart yards to help out, which left the Marlboro Yard short-handed.

76.     Traditionally, the Yard volume doubles at the end of the year because of end-of-the-year donations and weather-related car accidents.

77.     Hagen's reassignment of the two Yard employees caused a significant detriment to the functionality of the Yard.

78.     In addition to the lack of adequate Yard staffing, Hagen barred all overtime, without exception.

79.     As a result of Hagen's reassignment of the Yard personnel, the Yard fell behind with receiving duties (photographing and inventory).

80.     Hagen issued Plaintiff a documented verbal discipline for the lack of progress in the Yard, which was a direct cause of Hagen's removal of two Yard workers.

81.     In February 2017, McMillan began to drive Hagen's brand new BMW 2 Series coupe to work on a regular basis.

82.     At around this time, Regional Manager Cherie Hargrove visited the facility and specifically came down to the Yard to speak with Plaintiff.

83.     Hargrove made a specific reference to the personal relationship between Hagen and McMillan.

84.     In February 2017, Hagen issued Plaintiff a written disciplinary letter.

85.     In March 2017, Hagen issued a second disciplinary letter to Plaintiff.

86.     Hagen's verbal and written disciplinary actions were issued against Plaintiff solely to fabricate grounds to terminate Plaintiff's employment.

87.     Hagen terminated Plaintiff on March 29, 2017.

16

88.     Hagen terminated Plaintiff because of Hagen's sexual relationship with McMillan.

89.     No legitimate purpose existed for Plaintiff's termination.

90.     After terminating Plaintiff, Hagen assigned Plaintiff's position, duties and responsibilities to McMillan, a less qualified female.

91.     Plaintiff has been caused to suffer economic harm, embarrassment, emotional pain and suffering, anxiety, stress, and the physical manifestations of the same.

### AS AND FOR A FIRST CAUSE OF ACTION

92.     Plaintiff reiterates and repeats paragraphs numbered "1" through and including "91" in their entirety.

93.     Under the theory that Copart, Inc. is liable to the plaintiff for gender discrimination under a theory of disparate treatment in violation of Title VII of the Civil Rights Act of 1964, as amended 42 U.S.C. §2000e, *et. seq.*

### AS AND FOR A SECOND CAUSE OF ACTION

94.     Plaintiff reiterates and repeats paragraphs numbered "1" through and including "93" in their entirety.

95.     Under the theory that Copart, Inc. is liable to the plaintiff for gender discrimination under a theory of hostile work environment in violation of Title VII of the Civil Rights Act of 1964, as amended 42 U.S.C. §2000e, *et. seq.*

## AS AND FOR A THIRD CAUSE OF ACTION

96.    Plaintiff reiterates and repeats paragraphs numbered "1" through and including "95" in their entirety.

97.    Under the theory that Copart, Inc. is liable to the plaintiff for gender discrimination under a theory of disparate treatment in violation of the New York State Human Rights Law, Executive Law §296, *et seq.*

## AS AND FOR A FOURTH CAUSE OF ACTION

98.    Plaintiff reiterates and repeats paragraphs numbered "1" through and including "97" in their entirety.

99.    Under the theory that Copart, Inc. is liable to the plaintiff for gender discrimination under a theory of hostile work environment in violation of the New York State Human Rights Law, Executive Law §296, *et seq.*

## AS AND FOR A FIFTH CAUSE OF ACTION

100.    Plaintiff reiterates and repeats paragraphs numbered "1" through and including "99" in their entirety.

101.    Under the theory that Dave Hagen is liable to the plaintiff for gender discrimination under a theory of hostile work environment in violation of the New York State Human Rights Law, Executive Law §296, *et seq.*

## AS AND FOR A SIXTH CAUSE OF ACTION

102.    Plaintiff reiterates and repeats paragraphs numbered "1" through and including "101" in their entirety.

103.    Under the theory that Dave Hagen is liable to the plaintiff for gender discrimination under a theory of disparate treatment in violation of the New York State Human Rights Law, Executive Law §296, *et seq.*

WHERFORE, a Judgment is respectfully requested as and against each and every defendant:

- Awarding compensatory damages in an amount to be determined by a jury;

- Awarding economic damages for back pay and front pay with New York State and

federal statutory interest, respectively, in an amount to be determined by a jury;

- Awarding punitive damages as allowed under Title VII in an amount to be determined

by a jury;

- Awarding costs, disbursements and reasonable attorney's fees;

- Granting such other and further relief as the Court deems just and

fair.

Dated: March 26, 2018
　　　　　Scarsdale, New York

THE BELLANTONI LAW FIRM, PLLC
*Attorneys for Plaintiff, Andrew Berkowitz*


By:　＿＿＿＿＿＿＿＿＿＿/s＿＿＿＿＿＿＿＿＿＿＿＿＿＿
　　　Amy L. Bellantoni (AB3061)
　　　2 Overhill Road, Suite 400
　　　Scarsdale, New York 10583
　　　(914) 367-0090
　　　(914) 367-0095 (facsimile)

16